IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JORDAN A. BROWN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. JFM-11-240 |
| | * | |
| RAMONA BROCKETT, | * | |
| Defendant. | * | |
| | * | |
| | * | |

\*\*\*\*\*\*

MEMORANDUM

Plaintiff, Jordan A. Brown ("Brown"), filed this claim against defendant, Ramona Brockett ("Brockett"), alleging defamation and false light.[1] Brown, a resident of Delaware, seeks a jury trial, $500,000 in compensatory damages, and $500,000 in punitive damages, including attorneys' fees and costs, from Brockett, a resident of Maryland.[2] Brockett contends

---

[1] Brown initially filed suit against both Brockett and the University of Maryland, Eastern Shore ("UMES"), seeking $200,000 in compensatory damages. In his amended complaint, Brown dropped the claim against UMES, increased the compensatory damages he seeks, and added punitive damages.

[2] When a claim is brought under diversity jurisdiction in federal court, the court must determine whether the amount in controversy is sufficient to assume jurisdiction. The value of a plaintiff's claims for purposes of federal subject matter jurisdiction in a diversity case requires looking to state law to determine the nature and extent of the right the plaintiff seeks to protect. *See, e.g.*, *Wiggins v. North Am. Equitable Life Assurance Co.*, 644 F.2d 1014, 1017 (4th Cir. 1981) (holding that, under Maryland law, plaintiff was not entitled to a portion of the damages requested and therefore did not meet the amount in controversy threshold for diversity jurisdiction). The general rule is that the sum claimed by the plaintiff controls if the claim appears to have been made in good faith. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 303 (1938). Unless it appears to a legal certainty that the plaintiff's claim is for less than the jurisdictional amount, the court will not dismiss for lack of subject matter jurisdiction. *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348 (1961); *McDonald v. Patton*, 240 F.2d 424, 426 (4th Cir. 1957) ("In applying this test, it has been further recognized that . . . if it appears to a legal certainty that the plaintiff cannot recover the jurisdictional amount, the case will be dismissed for want of jurisdiction. . . . However, the legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim. If the right of recovery is uncertain, the doubt should be resolved, for jurisdictional purposes, in favor of the subjective good faith of the plaintiff.")

that, as a professor at the University of Maryland, Eastern Shore ("UMES"), she is a state employee and is therefore immune from suit under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann. State Gov't § 12-105. Brockett filed a motion for summary judgment as to all claims. The issues have been fully briefed, and a hearing is not necessary. *See* Local Rule 105.6. For the reasons that follow, Brockett's motion for summary judgment is denied.

## I.[3]

In 2009, plaintiff Jordan A. Brown ("Brown") was a senior at the University of Maryland, Eastern Shore ("UMES"), where he served as president of the Phi Alpha Delta Legal Fraternity ("PAD") from the spring of 2008 through February 2009. (Pl.'s Mot. Opp'n Summ. J. at 6 ("Pl.'s Opp'n"), ECF No. 47-1; Def.'s Mot. Summ. J. at 1, ECF No. 44-1.) Defendant Ramona Brockett, a professor at UMES, served as the advisor to the UMES chapter of PAD. (Def.'s Mot. Summ. J. at 1.) In that capacity, Brockett worked closely with Brown. (*Id*. at 2.) According to Brockett, their interactions were strictly "student-related" for the purposes of planning conferences and other PAD events. (Brockett Dep. 249:20–267:20, ECF No. 44-2.) Brown, however, contends there was more to their relationship, including Brockett's discussions of personal matters, such as her sexual history, her relationship with her parents, and the sexuality of other students and faculty members. (Brown Decl. ¶ 26, ECF No.47-5.) Brown also alleges that Brockett requested two loans from him, one for $1035, which he gave her, and another request for $1500, which he did not. (*Id*. ¶¶ 30–35.) Brockett disputes the amount of money exchanged and denies that the transaction was a loan; she says Brown volunteered to withdraw and give her $1000 cash in consideration of a post-dated check for $1000. (Def.'s Answers to Interrog. 7; ECF No. 48-3.) In January and February 2009, Brown claims Brockett

---

[3] The facts as set forth are stated in the light most favorable to plaintiff.

made harassing phone calls and sent harassing text messages and emails saying she missed him, needed to talk to him, and "needed [him] and [his] mind desperately." (Pl.'s Opp'n at 11; voicemails transcribed in Brown Dep. 207:3–213:20, ECF No. 47-10; emails Ex. 20, ECF No. 47-21.) In response to these repeated calls, emails, and texts, Brown resigned his position as president of PAD on February 6, 2009. (Pl.'s Opp'n at 11.) He emailed Brockett to explain that he was resigning to focus on other things leading up to graduation, (email from Brown to Brockett, ECF No. 48-9), but he also contacted UMES officials to explain that his resignation was due to the harassing voicemails and emails he received from Brockett. (*Id*. at 11.) Brockett eventually learned from another professor, Nicole Buzetto-Moore, that Brown had disclosed these details to university officials, (*id*. at 30), and that Brown told Buzetto-Moore that Brockett "wanted to (a) borrow money from him (b) wanted sex from him (c) had left all kinds of lewd messages for him on his machine [and] (d) was harassing him." (*Id*. at 9.) Brockett is currently on leave from UMES as a result of the allegations of harassment and defamation, and UMES has filed a grievance against her. (Brockett Dep. 101:7–14; 115:4–10.)

In the fall of 2009, Vincent Brown ("Vincent"), no relation to plaintiff, was appointed vice president of PAD. (Def.'s Mot. Summ. J. at 2.) Vincent applied to join PAD in November 2008 and submitted a check for the $70 membership dues along with his application. (*Id*.) Brown was PAD president when Vincent applied and was therefore responsible for depositing Vincent's check in the PAD bank account and forwarding all new membership dues to the national PAD headquarters. (*Id*.) Brown deposited the check in one of the local chapter's PAD bank accounts, but he resigned his position before forwarding Vincent's application and membership fee to PAD. (*Id*.) As a result, Vincent had never become a member of the national

PAD organization and was therefore forced to resign from his vice president post, a resignation Brockett called "both public and embarrassing." (*Id*.)

Following his resignation, Vincent contacted Byron Rupp ("Rupp"), the director of PAD International, to explain that his dues had been paid but never forwarded. (*Id*. at 3.) Rupp then contacted Brockett to discuss the situation and informed her that many PAD chapters across the country were experiencing problems with students misappropriating membership dues. (*Id*.) Rupp asked Brockett to inquire as to UMES policy regarding possible misappropriation of funds by fiduciary officers. (*Id*.) On February 2, 2010, Brockett drafted an email to James Lunnermon, director of Student Affairs for UMES, and copied fourteen other individuals, including other UMES faculty members, UMES administrators, PAD student board members, and three law professors at the University of Baltimore. (*Id*. at 3–4.) In the email, Brockett explained that Brown had been PAD president when Vincent applied for membership, that Brown's resignation had been "quite odd," and that he had not been forthcoming with the documents entrusted to him as the fiduciary officer. (*Id*.) She went on to say that Brown "cashed at least one check in his home state of Delaware instead of sending the monies into the PAD headquarters" and that they "would have never known of this misappropriation of funds" if Vincent had not been appointed vice president. (*Id*. at 4.) Brockett concluded by saying that Rupp was interested in severe sanctions against Brown, including stripping him of his PAD membership and informing law schools around the country of his misappropriation, and that Rupp had inquired into the procedure at UMES "for students who shirk their fiduciary responsibilities and misappropriate funds." (*Id*.) Brockett sent this email without contacting Brown directly and before any investigation had been done. (Brockett Dep. 110: 5.) Brockett

4

now contends that she did not accuse Brown of anything in the email but was merely relaying Rupp's request for information regarding sanctions. (*Id*. at 102:19–103106:18; 212:10–13.)

On March 1, 2010, Brockett emailed David Spinner ("Spinner"), chairperson of the UMES Department of Criminal Justice, and copied four other individuals, including Rupp and UMES students affiliated with PAD, encouraging Spinner to speak with Rupp regarding Brown's resignation and Vincent's missing check. (*Id*. at 5.) Spinner's investigation revealed that Brown had not misappropriated funds. (*Id*.) In response to this determination, Brockett again emailed Rupp, copying eleven other individuals, to tell him that Brown had apparently been cleared of the charges, and she was "puzzled" as to "how the conclusion could be that 'nothing' happened." (*Id*.; Email from Brockett to Spinner, ECF No. 44-7.) In response, Spinner requested that Brockett refrain from discussing the issue with people other than him until everything was resolved. (Email from Spinner to Brockett, ECF No. 47-18.) Ronnie Holden, vice president for Administrative Affairs at UMES, then wrote to Brockett March 3, 2010 ordering her to refrain from "inappropriately shar[ing] these allegations with various campus constituencies" and people "external to the campus" and to follow UMES policy as it relates to possible fiscal irregularity. (Letter from Holden to Brockett, ECF No. 47-6.)

Brockett admits she never investigated the matter before sending the emails, and to this day she has "no idea" whether Brown misappropriated any funds. (Brockett Dep. 176:7–18, 343:10–344:5.) She now says that, at the time, she "didn't think Jordan Brown had anything to do with it." (*Id*. 110: 7–8.) Brown contends that, as a result of Brockett's accusations, he was embarrassed and humiliated and suffered fear and anxiety that he would not get into law school. (Brown Dep. 33:22, 35:21–22, 149:22–151:13.) Brown is also concerned about his prospects for

future employment and his standing in the community and in personal relationships. (*Id*. at 149:21–25.)

On January 28, 2011 Brown filed a complaint against both UMES and Brockett, alleging defamation and false light and seeking $200,000 in compensatory damages. He subsequently amended his complaint to drop UMES as a defendant and to increase his compensatory damages request to $500,000 and add an additional $500,000 in punitive damages. Now pending before the court is Brockett's motion for summary judgment.

## II.

Rule 56 of the Federal Rules of Civil Procedure provides that a party may seek summary judgment on each claim or defense or part thereof. Summary judgment should be rendered when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Whether a fact is material depends on the substantive law. *See id*.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A party opposing a properly supported motion for summary

6

judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)); *see also Rivanna Trawlers Unltd. v. Thompson Trawlers*, *Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007).

### III.

#### A. Maryland Tort Claims Act Immunity

According to the Maryland Tort Claims Act ("MTCA"), Md. Code Ann. State Gov't § 12-105, state employees "are immune from suit in courts of the state and from liability in tort for a tortious act or omission that is within the scope of the public duties of the state personnel . . . and is made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b).[4] For purposes of a state employee's immunity under the MTCA, the meaning of "within the scope of the public duties of the state personnel" is generally "coextensive with the common law concept of 'scope of employment' under the doctrine of respondeat superior." *McReady v. O'Malley*, 804 F. Supp. 2d 427, 444 (D. Md. 2011) (quoting *Larsen v. Chinwuba*, 832 A.2d 193, 200 (Md. 2003)). The general measure of whether an employee's act was within the scope of his employment is whether the act was "in furtherance of the employer's business" or "authorized" by the employer. *Larsen*, 832 A.2d at 200. Such "authorization" need not be express; rather, an act can be authorized "even though in opposition to [the employer's] express and positive orders," if it was "incident to the performance of duties entrusted" to the employee.

---

[4] The Maryland Tort Claims Act's application to state employees is found in Md. Code Ann. State Gov't § 12-105, which refers to the "immunity from liability described under Md. Code Ann., Cts. & Jud. Proc. § 5-522(b)."

7

*Id*. (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 92 A. 478, 479–80 (1914)).  In determining whether certain conduct was authorized, the court should determine whether it was "of the same general nature as that authorized or incidental to the conduct authorized."  *Id*. at 201 (quoting *Sawyer v. Humphries*, 587 A.2d 467, 470 (1991)).  The following factors may be considered:

> (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the matter is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal.

*Id*.

In *Larsen*, the court held that the Maryland Insurance Commissioner was immune from suit for his allegedly defamatory statements because they were made in the scope of his employment.  The Commissioner there disclosed information to the press prior to the conclusion of a confidential investigation, in violation of state policy.  *Larsen*, 832 A.2d at 194.  Despite existing state policy authorizing disclosure only after a formal investigation is completed, the court held that the Commissioner's disclosure was within the scope of his employment.  *Id*. at 198–200.  The disclosure was made during the regular course of business, related entirely to the operations of the Insurance Administration, and was not seriously criminal.  *See id*. at 201–02.  However, the court went on to say that "where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment."  *Id*. at 202

(quoting *Sawyer*, 587 A.2d at 471) (internal quotations omitted).  Therefore, while failure to follow the statutory procedures governing press disclosure was insufficient on its own to constitute acting outside the scope of employment, acting to humiliate the victim or to benefit himself would have been outside the scope of employment.

When a plaintiff raises a state of mind issue to defeat summary judgment sought by a defendant who claims immunity, the plaintiff must point to specific evidence that raises an inference that the defendant's actions were improperly motivated.  *Thacker v. City of Hyattsville*, 762 A.2d 172, 189–90 (Md. Ct. Spec. App. 2000) (discussing qualified immunity for police officers whose actions were allegedly racially motivated).  That evidence must be sufficient to support a reasonable inference of ill will or improper motive.  *Id*. at 190.  Of course, where "there is not a scintilla of evidence" that improper motivation prompted the defendant's actions, summary judgment on the basis of immunity is appropriate.  *Id*. at 191 (quoting *Williams v. Prince George's Cnty.*, 685 A.2d 884, 896 (Md. Ct. Spec. App. 1996)).

In *Thacker*, the court discussed numerous examples of cases involving a claim of qualified immunity by defendants seeking summary judgment.  *Id*.  While immunity from suit is ordinarily a question of law for the court to decide, the *Thacker* court noted several examples in which a fact finder, if given the opportunity, could consider the disputed material facts and draw inferences of malicious conduct that would defeat immunity.  *Id*.  In those instances, "the tort counts were not amenable to disposition via summary judgment." *Id*. (quoting *Okwa v. Harper*, 757 A.2d 118 (Md. 2000)) (internal alterations omitted).

Both *Larsen* and *Thacker* are instructive here.  Despite the fact that Brockett did not follow UMES policy, her email would appear, at first glance, to be within the scope of her

employment as a professor and advisor to PAD.  When a discrepancy in accounting for Vincent Brown's membership fee was brought to Brockett's attention, she sent an email to fifteen people, alerting them to the issue and seeking guidance as to next steps.  While such wide reporting prior to any investigation was not in keeping with the University's policy on reporting of financial issues, Brockett's action was taken in the regular course of business, was not seriously criminal, and was within the realm of what might be expected in light of financial discrepancies in the student organization she oversees.  Thus, Brockett's email, while sent to individuals beyond the normal scope of University reporting policy and containing allegations that had yet to be investigated, could have been within the scope of her employment.  Her failure to follow University policy does not, alone, make her actions outside the scope of employment.

   However, considering the facts in the light most favorable to the non-moving party, a reasonable jury could conclude that Brockett hastily sent an accusatory email to members of UMES faculty, University of Maryland Law faculty, and UMES students affiliated with PAD for reasons other than furthering her employer's business.  There is evidence in the record indicating that Brown and Brockett had, at the very least, an unusual student-professor relationship, which ultimately led Brown to resign from his post as president of PAD and report his discomfort to UMES deans.  Brockett subsequently faced potential termination and sanctions as a result of the alleged harassing phone calls and emails she sent Brown.  In light of this threat to her position and reputation within the University, a reasonable jury could conclude that Brockett's email, which contained a direct allegation that Brown had misappropriated funds, despite Brockett's admission that she had no such information at the time she sent it, was motivated by something other than a desire to further PAD or UMES's business.

Moreover, assuming that the MTCA otherwise applies, a fact finder could conclude that Brockett is not protected by MTCA immunity because she acted with malice or gross negligence. The MTCA does not define malice.  Brockett would have the court apply the "actual malice" definition provided in *Davis v. DiPino*, which requires evidence that the defendant acted "without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Davis v. DiPino*, 637 A.2d 475, 479 (Md. Ct. Spec. App. 1994).  However, the Fourth Circuit has also interpreted the MTCA's malice standard to require a showing of "conduct motivated by ill will, by an improper motive, or by an affirmative intent to injure." *Young v. City of Mount Ranier*, 238 F.3d 567, 578 (4th Cir. 2001).  In *Sawyer v. Humphries*, MTCA malice was defined as "the intentional doing of a wrongful act without just cause, excuse, or justification which is reasonably calculated to injure another." *Sawyer*, 570 A.2d 341, 348 (Md. Ct. Spec. App. 1990) (reversed on other grounds). Gross negligence is defined as acting "wantonly and willfully" to inflict injury intentionally or being "so utterly indifferent to the rights of others that [the defendant] acts as if such rights did not exist." *Barbre v. Pope*, 935 A.2d 699, 718 (Md. 2007).  Gross negligence has also been defined as reckless or wanton conduct.  *See Shoemaker v. Smith*, 725 A.2d 549, 560 (Md. 1999). Here again, "[b]ald allegations of malice or gross negligence, absent more, are not sufficient to remove the immunity protective umbrella," *Sawyer*, 570 A.2d at 348, but specific facts giving rise to a reasonable inference of ill will or improper motive are enough to call a defendant's MTCA immunity into question.

There is therefore a genuine issue of material fact regarding Brockett's motivation.  A jury could find, as Brockett contends, that her actions were "reasonably responsive to the allegations brought to her attention with regard to Plaintiff."  (Def.'s Mot. Summ. J. at 12.)

However, a reasonable jury could also determine that the facts give rise to a different inference. If her actions were taken for personal reasons or to protect her own interests, even if during working hours and under the guise of her responsibilities as a professor and PAD advisor, a jury could find that her conduct was outside the scope of employment. A reasonable jury might alternatively conclude that Brockett sent the emails out of ill will or with an affirmative intent to injure Brown, thereby acting with malice, or that copying fourteen people on an email accusing Brown of theft without any knowledge that he had actually misappropriated the funds was wonton or reckless conduct. Thus, a question of fact remains as to whether Brockett lost her immunity by acting with actual malice or gross negligence. Summary judgment is therefore inappropriate on the basis of Brockett's claimed entitlement to MTCA immunity.

### B. Defamation

In the case of a non-public figure, a defamation claim requires proof that 1) the defendant made a statement tending to expose the plaintiff to public scorn to a third person who would recognize it as defamatory; 2) the statement was false; 3) the defendant was at fault for communicating it; and 4) the plaintiff suffered harm. *Offen v. Brenner*, 935 A.2d 719, 723–24 (Md. 2007). A statement is defamatory per se when the injurious character of the words is self-evident. *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1119 (Md. 1979). "Words which falsely charge a person with or impute to him the commission of a crime for which he is liable to be prosecuted or punished are actionable per se." *Am. Stores Co. v. Byrd*, 181 A.2d 333, 337 (Md. 1962). Thus, an accusation of theft is defamatory per se. *Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 731 (D. Md. 2009).

Brown satisfies both the first and second elements of a defamation claim. Brockett's email included allegations that he misappropriated funds, and the record reflects that, following

an investigation, Brown was not found to have misappropriated the funds. Brockett does not contend the allegations were in fact true or that she ever had information indicating that Brown had in fact stolen the money. Instead, she says she was instructed to investigate what the university does to punish misappropriation of funds, and she appears to have taken it upon herself to conclude that the explanation for Vincent's missing dues was that Brown had misappropriated the funds. Viewing the facts in the light most favorable to Brown, therefore, he was falsely accused of theft, which is defamatory per se.

The third element is Brockett's fault in communicating the defamatory statement. Brown has alleged both negligent defamation and malicious defamation. Fault may therefore be based on either negligence or constitutional malice, otherwise known as actual malice. *Batson v. Shiflett*, 602 A.2d 1191 (D. Md. 1992). Actual malice is established when the plaintiff shows the defendant published the statement either with knowledge of its falsity or with reckless disregard for its truth, while negligence requires that the defendant failed to act as a reasonable person would under the circumstances. *Henderson*, 607 F. Supp. 2d at 731. Brown's allegations survive summary judgment under either standard of fault.

Viewing the facts in the light most favorable to Brown, and drawing all reasonable inferences in his favor, there is little to suggest that Brockett acted as a reasonable person would under the circumstances.[5] Brockett sent an email charging Brown with misappropriation of funds he managed in a fiduciary capacity, despite the fact that Brockett admits she had no

---

[5] Brockett contends that negligent defamation may not lie against a state employee because the MTCA provides immunity for actions taken in the scope of employment unless grossly negligent or malicious. This argument, however, assumes that her actions were within the scope of employment. As discussed earlier, reasonable minds could differ as to whether Brockett was acting in the scope of her employment. Therefore, negligent defamation can be alleged against her.

information as to the truth of the allegation. In light of this admission and the alleged nature of Brown and Brockett's previous relationship, a jury could conclude that a reasonable person would not make such an accusation without investigation.

Similarly, a jury could find that Brockett's conduct rises to the level of actual malice because she acted with reckless disregard for the truth of the allegation, if not actual knowledge of its falsity. It is undisputed that Brockett's February email accused Brown of misappropriation of funds and that, at the time she sent the email, Brockett had no knowledge or information as to whether Brown was responsible. A jury could find, therefore, that Brockett acted with reckless disregard to the truth when she sent the accusatory email. Accordingly, the record presents an issue of material fact regarding the degree of Brockett's fault.

The final element in a defamation claim is damages. Even when harm is presumed because a statement is defamatory per se, Maryland law limits recovery to nominal damages unless the defamation plaintiff proves the defendant acted with some degree of fault. *Hearst Corp. v. Hughes*, 466 A.2d 486, 492 (Md. 1983). To recover compensatory damages, therefore, the plaintiff must show that the defendant acted (at least) negligently, *id*. at 493, and the Supreme Court has held that a defamation plaintiff must show "actual injury." *Gertz v. Robert Welch*, 418 U.S. 323, 349 (1974). "Actual injury," however, is not limited to pecuniary loss; "the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id*. at 350.

Because Brockett's statement was defamatory per se, "the law presumes that the reputation of the person about whom it was published has been injured." *Henderson*, 607 F.

Supp. 2d at 732. Therefore, Brown could recover at least nominal damages. Furthermore, under Maryland law, Brown need not prove damage to his reputation to recover; emotional distress, personal humiliation, and mental anguish are sufficient to recover compensatory damages. *Id*. (citing *Hearst*, 466 A.2d at 487). Brown alleges that he suffered, and continues to suffer, embarrassment and anxiety following the accusations in Brockett's email. Though he does not allege any monetary damages (other than the costs associated with this litigation, which he filed), and he did not seek any medical or psychological treatment as a result of the anxiety the allegations caused, such proof is not necessary. *Id.*

To recover punitive damages, Brown must prove by clear and convincing evidence that Brockett sent the email with actual knowledge of the falsity of the statement *LeMarc's Mgmt. Corp. v. Valentin*, 709 A.2d 1222, 1224 (Md. 1998). Reckless disregard for the truth is no longer a sufficient basis for punitive damages. *Id*. at 1226; *Hanlon v. Davis*, 545 A.2d 72, 80 n.4 (Md. 1988).

Genuine issues of material fact remain as to Brockett's fault. Therefore, summary judgment is denied on the defamation claim.

### C. False Light

To prove a claim of false light invasion of privacy, a plaintiff must show that 1) publicity was given to a matter concerning another that places the other before the public in a false light; 2) the false light in which the other person was placed would be highly offensive to a reasonable person; and 3) the actor had knowledge of or acted in reckless disregard to the falsity of the matter. *Mazer v. Safeway*, 398 F. Supp. 2d 412, 431 (D. Md. 2005).

To constitute "publicity before the public," a statement must be disclosed to either the public at large or to "so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id*. "[I]t is not an invasion of privacy to communicate a fact about someone's private life to . . . a small group of people." *Henderson*, 607 F. Supp. 2d at 733. In *Gladhill*, the court discussed what it takes to constitute "publicity." *Gladhill v. Chevy Chase Bank, F.S.B.*, No. 905, 2001 WL 894267, at *20 (Md. Ct. Spec. App. Aug. 1, 2001). "[A]ny publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons or any broadcast over the radio, or statement made in an address to a large audience, is sufficient" to constitute publicity. *Id*. The question remains, however, where to draw the line as to what constitutes a small or sufficiently large group of people.

In *Henderson*, a store clerk falsely accused a shopper of theft but did not announce the accusation over the loudspeaker or use a voice loud enough for everyone in the store to hear. *Henderson*, 607 F. Supp. 2d at 733. The clerk merely made her accusation "within earshot of a small group of individuals who may or may not have heard part or all of her statements." *Id*. The court there found the evidence insufficient to constitute "public" disclosure for a false light claim. *Id*. Similarly, in *Hill v. Abercrombie & Fitch*, the court held that the plaintiff had failed to establish "publicity" when the store clerk identified plaintiff as "suspicious" to security guards, and the guards escorted plaintiff through the mall in plain view of mall patrons. *Hill v. Abercrombie & Fitch*, No. ELH-11-00910, 2011 WL 4433573, at *11 (D. Md. Sept. 20, 2011). The fact that the *Hill* plaintiff was not accused of a crime at all, "let alone within earshot of more than a handful of patrons," led the court to dismiss plaintiff's false light claim for lack of sufficient publicity. *Id*. (citing *Henderson*, 607 F. Supp. 2d at 733).

Here, Brockett's February email went to a total of fifteen people, which is neither a small nor particularly large group. The group, however, consisted of parties from the University of Maryland, including professors and students, the international PAD organization, and professors at the University of Baltimore. Brockett contends that this group is too small to constitute "publicity," especially because all of the individuals were affiliated with the UMES chapter of PAD. She also claims that the "internal financial dealings of the group" are not an issue that is substantially certain to become one of public knowledge, (Def.'s Mot. Summ. J. at 20), yet she calls Vincent's resignation from the same group "public and embarrassing." (*Id*. at 2.) While the size of the group copied on the email is an arguable issue, it is significant that the individuals copied spanned three institutions and included students, professors, and administrators. Given that Vincent's resignation from PAD was considered "public," it seems likely, by Brockett's own logic, that accusing the former PAD president of theft would be a matter of similarly public concern that, once communicated to more than a handful of people, would become public knowledge. It has already been established that an accusation of theft would be offensive to a reasonable person and that Brockett may have acted with reckless disregard for the truth of her statement. Accordingly, Brockett's motion for summary judgment is denied as to the false light claim.

## Conclusion

For the aforementioned reasons, Brockett's motion for summary judgment is denied. A separate order follows.

| | |
|---|---|
| April 27, 2012 | /s/ |
| Date | J. Frederick Motz |
| | United States District Judge |